IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  | : |  |
|---|---|---|
| NICOLE B. | : |  |
|  | : |  |
| v. | : | NO. 23-CV-4957 |
|  | : |  |
| MARTIN O'MALLEY, | : |  |
| Commissioner of Social Security | : |  |
|  | : |  |

**O P I N I O N**

SCOTT W. REID  DATE:  July 25, 2024
UNITED STATES MAGISTRATE JUDGE

    Nicole B. brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  She has filed a Request for Review to which the Commissioner has responded.  As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.    *Factual and Procedural Background*

    Nicole B. was born on October 12, 1980.  Record at 282.  She obtained a high school diploma.  Record at 344.  She worked in the past as a plumber on construction sites.  *Id*.  On September 21, 2021, Nicole B. filed applications for DIB and SSI.  Record at 282, 289.  In them, she claimed disability since August 9, 2018, due to fibromyalgia, arthritis, vertigo, and mental illness.[1]  Record at 282, 343.

---

[1] The ALJ used an onset date of September 2, 2020, because Nicole B. had a previous denial which covered the period up to September 1, 2020, and which the ALJ declined to reopen.  Record at 17.

Nicole B.'s applications were denied initially, on January 6, 2022, and upon reconsideration, on April 15, 2022. Record at 99, 112. She then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 163. A hearing was held in this case on September 21, 2022. Record at 39. On September 27, 2022, however, the ALJ issued a written decision denying benefits. Record at 17.

The Appeals Council denied Nicole B.'s request for review on October 19, 2023, permitting the ALJ's decision to stand as the final decision of the Commissioner of Social Security. Record at 1. Nicole B. then filed this action.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration

requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record. *Id*. The RFC assessment reflects the most an individual can still do, despite any limitations. SSR 96-8p.

The final two steps of the sequential evaluation then follow:

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make the adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.   *The ALJ's Decision and the Claimant's Request for Review*

In his decision, the ALJ found that Nicole B. suffered from the severe impairments of fibromyalgia, polyarthralgia, osteoarthritis/degenerative disc disease, status post-cholecystectomy (i.e., gall bladder removal), pulmonary embolism, obesity, adjustment disorder, bipolar disorder, anxiety disorder, and post-traumatic stress disorder. Record at 20. He found that Nicole B.'s alleged carpal tunnel syndrome was not a severe impairment, because it was a recent diagnosis, and there was no evidence it would last for the statutory twelve months. *Id*. Her vertigo and a vitamin D deficiency were also found to be non-severe, since they did not require continuing treatment in the relevant time period. *Id*.

3

According to the ALJ, none of Nicole B.'s impairments, and no combination of impairments, met or medically equaled the severity of one of the listed impairments.  Record at 20.

The ALJ determined that Nicole B. retained the RFC to perform a limited range of light work, writing:

> I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR §404.1567(b) and §416.967(b) except climb ramps and stairs occasionally; never climb ladders, ropes, and scaffolds; stoop, kneel, and crouch occasionally; never crawl; bilateral reaching overhead and in all other directions is limited to frequent; bilateral handling, fingering, and feeling is limited to frequent; must avoid concentrated exposure to extreme cold, humidity, and vibration; can never be exposed to unprotected heights and dangerous unguarded moving machinery; limited to simple tasks in a routine work environment; no more than frequent interaction with supervisors and co-workers; no more than occasional interaction with the general public, but would be able to have frequent interaction during a 30-day training period; and limited to low stress work, which is defined as routine work with no more than occasional changes in work.

Record at 22.

Relying on the testimony of a vocational expert who appeared at the hearing, the ALJ found that Nicole B. could not return to her previous work as a plumber.  Record at 30.  However, he found that jobs existed which she could perform, such as housekeeper, mail sorter or marker.  Record at 32.  He decided, therefore, that she was not disabled.  *Id*.

In her Request for Review, Nicole B. argues that the ALJ wrongly rejected the opinions of her treating Certified Nurse Practitioner, Victoria Korkus.  She also maintains that he erroneously failed to consider some of her severe impairments/symptoms, specifically her insomnia, headaches, and hallucinations.

IV.     *Discussion*

   A.     *Nurse Korkus's Opinions*

Victoria Korkus, CRNP, Nicole B.'s treating medical practitioner, submitted a form titled "Arthritis Medical Opinion" dated July 28, 2022.  Record at 1595.  She diagnosed Nicole B. with fibromyalgia[2], osteoarthritis, and "probable CTS" (i.e, carpal tunnel syndrome), indicating that she suffered from "widespread pain over muscles and joints" and that it was "daily" with "no pattern." *Id*.  She indicated that Nicole B.'s depression and anxiety contributed to the severity of her symptoms and functional limitations.  Record at 1596.  She declined to opine as to how many blocks Nicole B. could walk without pain, how much she could lift, or how long she could sit or stand at one time.  Record at 1596, 1598.  However, she checked off that Nicole B. could only sit or stand/walk for less than two hours each in an 8-hour workday.  *Id*.

Nurse Korkus also indicated that Nicole B. was likely to be "off task" at work 25% of the day or more "due to fibro."  Record at 1597, 1598.  She would also be absent more than four days per month because of her symptoms if working full-time.  Record at 1598.  These limitations would be work-preclusive.  Record at 56-7.

The ALJ found Nurse Korkus's opinions "not persuasive."  Record at 29.  In so finding, however, he made a meaningful error.  He wrote:  "The reason provided, the claimant's fibromyalgia fog[3], was not document [*sic* "documented"] with this provider or with the

---

[2] Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." S.S.R. 12-2p.  There are "unique difficulties associated with diagnosing fibromyalgia, as there are no objective tests which conclusively confirm the disease." *Merritt v. Berryhill*, Civ. A. No. 17-808, 2018 WL 1162848 at *10 (E.D. Pa. Mar. 5, 2018).  There is no specific laboratory test for fibromyalgia.  Http://niams.nih.gov/health-topics/fibromyalgia.  Further, fibromyalgia patients often manifest normal muscle strength and neurological reactions on examination, and have a full range of motion. *Lintz v. Astrue*, Civ. A. No. 8-424, 2009 WL 1310646 at *7 (W.D. Pa. May 11, 2009).

[3] "'Fibro fog' is the name commonly given to the cognitive problems that can go along with fibromyalgia syndrome. These problems with concentration and memory can lead to confusion, losing your train of thought, or forgetting or mixing up words or details."  Https://myhealth.alberta.ca.

5

claimant's rheumatologist." *Id*. However, as noted above, Nurse Korkus never used the term "fibromyalgia fog" or "fibro fog." Nicole B. plausibly argues that Nurse Korkus was not referring to fibro fog, but meant that her concentration would be impaired by the pain caused by fibromyalgia.

It is clear, therefore, that the ALJ made an inaccurate statement in evaluating Nurse Korkus's submission. However, other comments he made were more pertinent to fibromyalgia pain. Crucially, as to the level of pain Nicole B. experienced, as reflected in Nurse Korkus's opinion, the ALJ wrote:

> [T]his opinion is not consistent with the claimant's treatment history, or more expressly, not consistent with the claimant's gap in treatment from March 2020 to November 2021 for pain management, and from August 2020 to October 2021 for rheumatologist without requiring any additional intervention from her primary care provider or emergency care.

Record at 29.

Elsewhere, the ALJ made it even more clear that fibromyalgia pain was part of his analysis, although he did not mention Nurse Korkus in this paragraph:

> I considered the allegation of severe pain that would require additional non-productive limitations, such [as] unscheduled breaks or frequent absences; however, the claimant had no emergency room treatment for pain during her yearlong-plus gap in treatment with her rheumatologist or pain management provider.

Record at 28.

Nicole B. does not deny these gaps in her pain management and rheumatology, but argues that they were caused by the fact that she "was treating very significantly for her mental health impairments" at those times. *Request for Review* at 13. She states that she "was seen on almost a monthly basis to treat her ongoing issues with mental health." *Id*.

6

This is not convincing.  First, mental health treatment "on almost a monthly basis" is very minimal.  In any event, whatever Nicole B.'s level of mental health treatment, it was reasonable for the ALJ to infer that she would have sought pain control if her joint and body pain was as debilitating as described by Nurse Korkus.

Further, before turning to the medical opinion evidence, the ALJ discussed the limitations he included in his RFC assessment, writing:  "Despite the claimant's testimony, and her provider's statement [citing Nurse Korkus's report] of fibromyalgia **fog or pain** causing poor concentration, I found no documented evidence beyond the claimant's documented abnormal affect."  Record at 28.  (Emphasis supplied).  Thus the ALJ recognized that pain was a factor alleged to affect Nicole B.'s concentration.

Moreover, whatever the factors potentially affecting Nicole B.'s ability to concentrate, the ALJ observed that "there was no support for conclusions as to this level [of] off-task restriction and absenteeism, as the claimant was universally noted to be alert and fully oriented." Record at 29.  As the ALJ noted, Nicole B. was called "alert" and fully oriented, with "intact" concentration, on September 8, 2022, when she sought inpatient admission for mental health treatment at Horizon House.  Record at 27, citing Record at 1920.  Mental status screens by her treating practitioners showed a fairly normal ability to function, despite depression and insomnia.  Record at 27, *citing* Record at 1211 (PMA Medical Specialists note of July 11, 2018:  "Oriented to time, place, person, and situation.  Appropriate mood and affect.  Normal insight.  Normal judgment"); 1850 (PMA Medical Specialists note of December 21, 2021:  "appropriate mood and affect").

The ALJ also noted normal physical examinations from PMA Medical Specialists on March 4, April 6, and August 24, 2022, around the time that Nurse Korkus submitted her form. Record at 867, 1886, 1896.

Since fibromyalgia patients often have normal strength and range of motion, it is obvious that normal physical examinations cannot rule out the existence of fibromyalgia-related pain. Nevertheless, in evaluating Nicole B.'s condition as a whole, it is worth noting that consulting examiner Ziba Monfared, M.D., who saw her on December 29, 2021, found she could engage in work at the medium exertional level, given her normal physical examination. Record at 1281-1299. Dr. Monfared specifically mentioned finding none of the "positive trigger points" that characterize fibromyalgia. Record at 1283.

Notably, the ALJ rejected Dr. Monfared's report as unpersuasive, writing: "I find that a functional capacity that does not consider the claimant's fibromyalgia or obesity is not well supported by the entire record."[4] Record at 29. Thus, he clearly accepted Nicole B.'s claims of body pain to a great extent.

In sum, even though the ALJ was wrong in criticizing Nurse Korkus for relying on "fibromyalgia fog," he primarily rejected her report on the basis of Nicole B.'s failure to seek treatment for pain for years at a time. He cited substantial evidence supporting his reasoning. These gaps in treatment for pain would undoubtedly lead the ALJ to reject Nurse Korkus's report

---

[4] Nicole B. argues that the ALJ found all of the medical opinions to be non-persuasive, and therefore, must have impermissibly relied upon "his own lay opinion." *Request for Review* at 15. Clearly, however, the ALJ's RFC assessment fell somewhere between the opinions of Nurse Korkus and Dr. Monfared, and also took into account Nicole B.'s numerous medical treatment records. This is entirely appropriate. An ALJ is empowered to consider all of the evidence in arriving at an RFC assessment. 20 C.F.R. §404.1545(a) ("We will assess your [RFC] based on all the relevant evidence in your case record"); *Chandler v. Commissioner of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011) ("[T]he ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision").

even if this matter were remanded for him to correct his error about "fibro fog." Therefore, remand is not required. *Rutherford v. Barnhart*, 339 F.3d 546, 552 (3d Cir. 2005) (remand is not necessary to correct an error where it would not affect the outcome of a case).

    B.    *The RFC Assessment*

        1.  *Moderate Impairments in Mental Functioning*

In his RFC assessment, the ALJ found that Nicole B. had moderate impairments in the four areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, and maintaining pace; and adapting or managing oneself. Record at 21-22.

Regarding non-exertional impairments, the ALJ wrote in his RFC assessment:

> [The claimant is] limited to simple tasks in a routine work environment; no more than frequent interaction with supervisors and co-workers; no more than occasional interaction with the general public, but would be able to have frequent interaction during a 30-day training period; and limited to low stress work, which is defined as routine work with no more than occasional changes in the work.

Record at 22.

There is no merit to Nicole B.'s claim that these limitations are inadequate to address a moderate impairment in concentration. The Court of Appeals for the Third Circuit has said – although in a non-precedential opinion – that "[p]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration." *Menkes v. Astrue*, 262 Fed. App'x. 410, 412 (3d Cir. 2008).

Recently, moreover, a court in this District found that a limitation to "simple, routine tasks and simple work-related decisions" was adequate to accommodate a claimant's "poor" concentration. *Purdy v. Kijakazi*, Civ. A. No. 22-2048, 2023 WL 6626124 at *9 (E.D. Pa. Oct. 11, 2023); *and see Karlin v. Saul*, Civ. A. No. 20-3113, 2021 WL 2036649 at *5 (E.D. Pa. May

9

21, 2021) (Discussing cases decided after *Hess v. Commissioner of Social Security*, 931 F.3d 198 (3d Cir. 2019) and concluding that "courts have routinely found that a limitation to 'unskilled work' can be sufficient to account for moderate mental limitations"), and *Starr v. Saul*, Civ. A. No. 19-920, 2020 WL 1975080 at *15 (E.D. Pa. Apr. 24, 2020) (restriction to "simple tasks" was adequate to address a moderate limitation in concentration, where adequately explained, citing *Hess*).

There is more merit to Nicole B.'s argument that it made no sense to find that she would be able to interact with the public more frequently during a 30-day training period. Usually, an ALJ will find that a claimant can interact with a *supervisor* more frequently during a 30-day training period, since the claimant will be trained by a supervisor. *See Littlejohn v. Kijakazi*, Civ. A. No. 22-4678, 2023 WL 4564548 at *3 (E.D. Pa. July 17, 2023), *and cases cited therein*. This, however, appears to have been an insignificant drafting error by the ALJ, since the jobs he found Nicole B. capable of performing do not involve interaction with the public.

    2.  *Insomnia, Headaches, and Hallucinations*

Nicole B. acknowledges that the ALJ took note of her insomnia and hallucinations in his decision. She argues, however, that he erred in failing to include specific limitations which would address them in his RFC assessment. She further complains of his failure to discuss her headaches. Nicole B. suggests that insomnia, headaches, and hallucinations could have been treated as additional medical impairments. In that case, she argues, the ALJ also erred in failing to determine whether they were severe or non-severe.

Initially, the medical record is not supportive of Nicole B.'s claim that her headaches, insomnia, or hallucinations could be considered separate impairments. She has never been diagnosed with a discrete headache or sleep impairment. Indeed, sleep testing on February 20,

2020, revealed no sleep apnea or periodic limb movements. Record at 1258. Nicole B.'s auditory and visual hallucinations have always been treated by her mental health practitioners as part of the same diagnoses which the ALJ conceded were severe. Record at 20 (ALJ list of severe impairments), 1409, 1474, 1566 and 1578 (notations of hallucinations); 1423-4 (Creative Health Services list of diagnoses, dated January 7, 2022, including bipolar disorder, anxiety disorder, alcohol abuse in remission, and post-traumatic stress disorder).

Further, examination of the record reveals that the ALJ adequately treated these symptoms in his decision. Nicole B. did not mention suffering from headaches at her hearing before the ALJ, even in the pre-prepared statement which she read into the record. Record at 51-2. Nor did her counsel mention headaches in her statement to the ALJ. Record at 44. They are not mentioned in lists of symptoms in her function reports. Record at 343, 355. Even Nicole B. cites only one medical record where she complained of "headaches upon awakening" to PMA Medical Specialists, on January 14, 2020. Record at 1221, 1801 (reproduction of the same report). Since Nicole B. never made headaches a significant part of her claim, it is unsurprising that the ALJ did not discuss headaches in his decision, or include a specific limitation regarding headaches in his RFC assessment.

On the contrary, there is ample evidence of sleep disturbance in the record. As noted, Nicole B.'s general practitioner referred her for sleep studies in February 2020, which revealed reduced sleep efficiency without REM sleep, and with difficulty falling asleep, but did not find a physiological cause such as sleep apnea, or limb movement. Record at 1258. Nicole B.'s treating mental health practitioners noted her difficulties with sleep, especially when she was anxious. Record at 1404, 1444, 1474 (September 19, 2020 note: "'anxiety through the roof lately.' Excessive worry, stayed up 2 days straight this week … last night she slept 3 hours");

1479, 1595, 1920.  Also, Nicole B. mentioned sleep disturbance in her function reports, as well as at her hearing.  Record at 51, 355 ("long periods of sleeping"), 357 ("wake up multiple times, can't sleep without meds").

      The ALJ did not ignore Nicole B.'s sleep issues.  He mentioned them in his decision in the context of her hearing testimony, function reports, treatment notes from PMA Medical Specialists, and in her mental health treatment notes.  Record at 24, 26.  Relevantly, he specifically mentioned Nicole B.'s interrupted sleep in his determination that she suffered from a moderate limitation in concentration.  Record at 21.  It is evident, therefore, that Nicole B.'s sleep difficulties was part of the limitations the ALJ imposed in his RFC evaluation.

      There are also consistent mentions of auditory hallucinations in the record, as well as a few mentions of visual hallucinations.  Nicole B. mentioned "hearing voices" in her statement during the hearing, and listed auditory and visual hallucinations in her function report.  Record at 51, 362.  Hallucinations were also mentioned in the mental health treatment notes.  The September 18, 2020, treatment note which mentions that Nicole B. was anxious and sleeping badly continues:  "AH people calling her name, 'why did she do that'."  Record at 1747.  It goes on:  "thought she saw an animal in the street while driving, so she has decreased her driving since this.  This is a typical episode for her."  *Id*.  (It is not entirely clear, however, why Nicole B. knew it was not a real animal).

      A March 8, 2022, treatment note also mentions auditory hallucinations.  Record at 1578.  A May, 2022, treatment note reports:  "Continues to experience AH, but states the voices have been supportive, stressing that her sister will be fine."  Record at 1566.  At Horizon House, on September 8, 2022, Nicole B. reported that she had a past history of auditory hallucinations "at bedtime."  Record at 1916.

Unquestionably, auditory and visual hallucinations are not to be taken lightly as a sign of mental disorder.  The ALJ did not ignore this evidence.  Record at 21, 24, 27.  He recognized that Nicole B.'s September 8, 2022, diagnosis from Horizon House was of a major depressive disorder with psychotic symptoms, and that she was prescribed antipsychotic medication.  Record at 27, 1920, 1921.

Nevertheless, the ALJ concluded that Nicole B. was still capable of a limited range of work, and explained his reasoning:

> I find no more than moderate limitations [in mental functioning], because even in [the] setting of increased hallucinations, depression, or suicidal ideation, the claimant grossly remained at her baseline.  At her in-person September 8, 2022, exam, the claimant retained good insight and judgment, intact concentration, intact recent memory, good remote memory, [an] average fund of knowledge, and was capable of abstraction.

Record at 27, *citing* 1919-1920.

This was an accurate description of Nicole B.'s mental status examination performed at Horizon House, although she was also noted to have a depressed mood and constricted affect.  Record at 2020.  Earlier, the ALJ wrote that Nicole B.'s "mental status examination findings grossly remained consistent over the telehealth treatment visits" with her usual mental health provider, and that her "mental health status screens with her physical treating providers were largely unremarkable."  Record at 27.  The ALJ particularly noted an August 24, 2022, visit to Penn Primary Care, where the doctor described her as neurologically normal, with no focal deficits and a mental status "at baseline", and also reported that she was fully oriented, with a normal mood and affect, and normal thought content, judgment, and behavior.  Record at 27, 1867.

13

Nicole B. is therefore incorrect in arguing that the ALJ failed to explain "how he accounted for" her hallucinations. *Request for Review* at 7. She has not pointed to any evidence that her hallucinations were more intrusive than the ALJ found them to be. As disturbing a symptom as hallucinations are, therefore, Nicole B. has not successfully demonstrated a basis for interference with the ALJ's decision regarding them.

V.    *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be denied, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*
_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE