**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICOLE BYRD | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 23-4957 |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                                    October 30, 2024

A former plumber with at least four physical ailments from 2020 to 2022 challenges the Social Security Administration's October 2023 decision denying her disability insurance benefits and supplemental security income. She presented her medical records and medical expert opinions in a hearing before an administrative law judge charged with determining whether she is disabled from working. The Administration presented counter medical expert opinions. The administrative law judge is required to study all admitted medical opinions and not substitute his judgment for medical professionals and is not required to give controlling weight to treating physicians' opinions. The judge evaluated the former plumber's and the Administration's medical opinions, discounted several of the opinions in part for stated reasons (but misnamed the cause for poor concentration written in one medical opinion), and issued fact findings based on the record leading him to deny benefits. The former plumber then sued for benefits here claiming the judge erred. Our colleague Judge Reid issued a comprehensive Report and Recommendation recommending we dismiss her challenges to the administrative law judge's detailed findings.

We today address the former plumber's one objection to Judge Reid's Report. We agree with Judge Reid the administrative law judge made a mistake about the cause of poor concentration in one medical opinion but find his mistake does not warrant remand. The administrative law judge

adequately evaluated and described the discrepancies in the medical opinions. We lack a basis to substitute our medical impressions for the administrative law judge's fact findings. We overrule the former plumber's one objection to Judge Reid's Report requiring we enter judgment in favor of the Social Security Commissioner on the submitted administrative record.

## I.    Background

Forty-four-year-old Nicole Byrd has a variety of medical concerns including vitamin D deficiency, carpal tunnel syndrome, obesity, and vertigo.[1] Ms. Byrd worked as a plumber before 2017.[2] A 2017 car accident worsened her physical ailments.[3] She could no longer work as a plumber.[4] She experienced widespread pain.[5] She began seeking medical care to address fibromyalgia, polyarthralgia, osteoarthritis/degenerative disc disease, post-cholecystectomy health management, and a pulmonary embolism.[6]

### *Fibromyalgia and joint pain.*

Ms. Byrd has fibromyalgia (a disorder causing pain and tenderness throughout the body) and polyarthralgia (which causes pain in multiple joints).[7] Ms. Byrd frequently saw a rheumatologist with follow up visits to a nurse practitioner at the rheumatology clinic. Ms. Byrd first saw rheumatologist Sucharitha Shanmugam, MD for "pain all over" on January 14, 2020.[8] Dr. Shanmugam diagnosed Ms. Byrd with polyarthralgia and fibromyalgia.[9] A nurse practitioner at the same clinic, Victoria Korkus, Certified Registered Nurse Practitioner, noted a month later Ms. Byrd suffered from the chronic conditions of fibromyalgia, bilaterial low back pain with bilateral sciatica, and primary osteoarthritis (a degenerative joint disease) of both knees.[10] Nurse Practitioner Korkus treated Ms. Byrd for osteoarthritis, fibromyalgia, and chronic pain on numerous occasions.[11] Nurse Practitioner Korkus encouraged Ms. Byrd to exercise and lose weight

to help with the osteoarthritis in her knees and with her fibromyalgia.[12] Ms. Byrd stopped going to the rheumatologist's office from August 2020 to October 2021.[13]

Ms. Byrd took a number of prescribed medications, including duloxetine, for her pain.[14] She told Nurse Practitioner Korkus at her rheumatology appointment in October 2021 the duloxetine did not help her pain.[15] Nurse Practitioner Korkus instructed her to wean off the duloxetine and take Tylenol.[16] She told Nurse Practitioner Korkus on July 28, 2022 of ongoing pain, described as "achy and tingling[]" all over her body, and swelling in her hands and ankles.[17]

Ms. Byrd saw internal medicine doctor Manjula Kandaa Raman, MD on August 24, 2022 for a fainting issue.[18] Dr. Raman reviewed Ms. Byrd's musculoskeletal system (bones, muscles, and joints) and found Ms. Byrd negative for back pain, joint pain, and myalgias (muscle pain).[19]

### *Knee and back problems.*

Ms. Byrd suffers from osteoarthritis in both knees and back problems including arthritis and bilateral sciatica.[20] Ms. Byrd also saw a pain management provider for her knee and back pain.[21] She underwent several nonsurgical procedures, including lumbosacral facet joint denervations (a procedure using a heated needle to damage portions of nerves sending pain signals) on November 12, 2021 and December 3, 2021, for her back pain.[22] Ms. Byrd had a follow-up appointment on January 10, 2022 where she reported significant but not complete improvement of her lower back pain.[23] Her pain management provider started her on a course of physical therapy to improve her range of motion and decrease her pain.[24] Ms. Byrd attended physical therapy from January 2022 to March 2022.[25] Her physical therapist discharged her on March 15, 2022 citing improvements in pain and functionality.[26]

Ms. Byrd's pain management provider performed injections on her knees on March 11, 2022 and March 18, 2022.[27] Ms. Byrd reported a ninety-five percent improvement in her knee pain about three weeks after receiving the injections.[28]

### Blood clot in lung and inflamed gallbladder.

Ms. Byrd checked into Phoenixville Hospital for chest pain and remained in inpatient care from April 3 to April 6, 2020. The hospital providers diagnosed a pulmonary embolism, leukocytosis (high white blood cell count), and an impacted gallstone.[29] The medical providers found Ms. Byrd negative for acute cholecystitis (inflammation of the gallbladder), but started her on prescription drug Eliquis for the acute pulmonary embolism.[30] Ms. Byrd did well on the Eliquis without shortness of breath, chest pain, leg swelling, or bleeding, and her pulmonary embolism remained stable at a July 24, 2020 medical appointment.[31] Dr. Raman noted in August 2022 Ms. Byrd had a history of only one pulmonary embolism and, as such, recommended Ms. Byrd schedule an appointment with a hematologist to determine if she could stop taking Eliquis.[32] Eliquis limited Ms. Byrd's pharmacological options to help with her fibromyalgia pain.[33]

A hepatobiliary scan (an imaging of the function of the liver, gallbladder, and bile ducts) performed in July 2020 showed no evidence of cholecystitis but showed some inconsistency in uptake of a radiotracer by the liver suggesting hepatocellular disease.[34] But a December 2020 screen revealed cholecystitis and Ms. Byrd underwent a laparoscopic cholecystectomy (gallbladder removal).[35] Medical professionals reported her status post-cholecystectomy as "stable on December 16, 2020."[36]

### Ms. Byrd unsuccessfully seeks disability and income benefits.

Ms. Byrd applied for social security disability and disability insurance benefits as well as supplemental security income on September 3, 2021.[37] She alleged disability beginning August 9,

4

2018 but the relevant time period begins September 2, 2020.[38] The Social Security Administration denied Ms. Byrd's application and denied reconsideration a few months later.[39] Ms. Byrd requested a hearing which Administrative Law Judge Marc Silverman conducted via telephone on September 21, 2022.[40]

Judge Silverman examined whether Ms. Byrd is disabled under the Social Security Act following the Commissioner's initial denial of benefits. Congress affords insurance benefits to mentally or physically disabled persons who have contributed to social security.[41] A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"[42] A claimant is only disabled if her impairments are severe to the point it makes her previous work impossible or precludes any other kind of gainful work available in the national economy.[43]

Judge Silverman applied the long-established required five-step analysis for determining whether an individual should receive disability benefits. He found Ms. Byrd (1) has not engaged in substantial gainful activity since September 2, 2020; (2) has severe impairments of fibromyalgia, polyarthralgia, osteoarthritis/degenerative disc disease, post-cholecystectomy health management, pulmonary embolism, obesity, adjustment disorder, bipolar disorder, anxiety disorder, and post-traumatic stress disorder; (3) does not have impairments equivalent to the listed impairments in appendix 1 rendering her conclusively disabled; (4) cannot return to past work; but (5) can adjust to other work.[44] Judge Silverman concluded she is not disabled because she can do other work.[45]

Judge Silverman found several medical opinions concerning her ability to work unpersuasive, including the opinion of Nurse Practitioner Korkus, Ms. Byrd's primary care provider at the rheumatology clinic.[46] Nurse Practitioner Korkus's opinion notes Ms. Byrd has

fibromyalgia and osteoarthritis with a good prognosis, experiences widespread pain, fatigue, and dizziness, suffers from depression and anxiety, can sit for less than two hours in an eight-hour day and stand/walk for less than two hours in an eight-hour day, requires a job which permits shifting positions and periods of walking around, and requires a job which permits unscheduled breaks.[47] Nurse Practitioner Korkus drew question marks where the questionnaire asked her to circle how long Ms. Byrd could sit or stand at one time and how many minutes Ms. Byrd would need to walk during an eight-hour work day.[48] Nurse Practitioner Korkus did not know how many pounds Ms. Byrd can carry, did not know how often Ms. Byrd can perform activities such as twisting, crouching, and climbing stairs, and did not know what percentage of time Ms. Byrd can use her hands, fingers, and arms for activities such as grasping objects and reaching.[49] Nurse Practitioner Korkus opined Ms. Byrd is capable of low stress work but would likely be off task for more than twenty-five percent of the workday "due to fibro" and would likely miss more than four days of work per month.[50]

Judge Silverman found no support for Nurse Practitioner Korkus's conclusions regarding Ms. Byrd's off task restrictions and absenteeism because "[t]he reason provided, the claimant's fibromyalgia fog, was not document[ed] with this provider or with the claimant's rheumatologist" and Ms. Byrd was "universally noted to be alert and fully oriented."[51] Judge Silverman also found Nurse Practitioner Korkus's opinion to be internally inconsistent because she "stat[ed] how much standing, walking, and sitting could be perform[ed] in a day, but then [felt] unqualified to assess how much of these activities could be performed at one time."[52] Nor was the opinion consistent with the gap in Ms. Byrd's treatment history, as Ms. Byrd did not receive pain management treatment from March 2020 to November 2021 or rheumatology treatment from August 2020 to October 2021 yet did not require intervention from her primary care provider or emergency care.[53]

Judge Silverman also rejected the medical opinion of Ziba Monfared, MD from Ms. Byrd's consultative examination as internally inconsistent (e.g., Dr. Monfared notes Ms. Byrd could never balance but also finds she would not require a cane or assistive device) and does not address all of her severe impairments, such as her elevated body mass index.[54] Judge Silverman also rejected the opinions of Paul Smith, MD, the state agency medical consultant, and Angela Walker, MD on reconsideration—both of whom concluded Ms. Byrd could perform a range of ***medium*** exertional tasks—because their opinions relied on Dr. Monfared's unpersuasive consultative examination.[55]

But Judge Silverman found persuasive the opinions of the state agency psychological consultant, Arlene Rattan, Ph.D (and Valerie Rings, Psy.D, on reconsideration), who concluded Ms. Byrd can follow simple instructions, make simple decisions, and perform routine, repetitive tasks.[56] Judge Silverman found Ms. Byrd has moderate limitations, as reflected in his assessment of Ms. Byrd's residual functional capacity (i.e., the most she can do despite her limitations).[57]

Judge Silverman concluded Ms. Byrd has the residual functional capacity to perform light work with some additional postural, manipulative, and environmental restrictions.[58] She is limited to simple tasks in a routine work environment with no more than frequent interaction with supervisors and coworkers and no more than occasional interaction with the general public (but she would be able to have more frequent interactions during a thirty-day training period).[59] Ms. Byrd is limited to low stress work, which means routine work with no more than occasional changes in the work.[60]

Vocational expert Diana Sims testified as to Ms. Byrd's ability to do her old job or adjust to other work given her limitations.[61] Judge Silverman posed a hypothetical about an individual with a light exertional level and limitations consistent with Ms. Byrd's limitations.[62] The vocational expert swore an individual with these limitations could obtain employment as a

housekeeper, a mail sorter, or a price marker.[63] Judge Silverman also asked whether an individual who would be off task for more than fifteen percent of the day and absent from work three days a month could perform any work.[64] The vocational expert replied this level of absenteeism and time off task is not consistent with competitive employment.[65] The testimony regarding absenteeism and time off task did not impact Judge Silverman's ultimate finding of "not disabled" because he did not credit the only medical opinion (Nurse Practitioner Korkus's) concluding Ms. Byrd would frequently be off task and/or absent from work.

Judge Silverman denied Ms. Byrd social security benefits on September 30, 2022.[66] Ms. Byrd sought review by the Appeals Council, which denied her review on October 19, 2023.[67]

### Judge Reid affirms Judge Silverman's findings.

Ms. Byrd then sued seeking our review of the Administration's denial of benefits.[68] We referred her request for review to Judge Reid for a Report and Recommendation.[69] Judge Reid recommended we deny Ms. Byrd's request for review leading to today's analysis of her singular objection to Judge Reid's Recommendation.

Judge Reid found Judge Silverman made an inaccurate statement about Nurse Practitioner Korkus's medical opinion. Nurse Practitioner Korkus concluded Ms. Byrd would likely be off task for more than twenty-five percent of a workday and would likely miss four or more days of work a month "due to fibro" but Judge Silverman misconstrued this statement.[70] Judge Silverman found Nurse Practitioner Korkus's opinion unpersuasive in part because "[t]he reason provided, the claimant's fibromyalgia fog, was not document[ed] with this provider or with the claimant's rheumatologist."[71] Ms. Byrd argues Nurse Practitioner Korkus was not referring to fibro fog but meant Ms. Byrd's concentration would be impaired because of the pain associated with fibromyalgia.[72] Judge Reid found this argument plausible but still accepted Judge Silverman's

treatment of Nurse Practitioner Korkus's opinion because Judge Silverman discussed Ms. Byrd's pain elsewhere in his analysis and had other reasons for rejecting Nurse Practitioner Korkus's opinion.[73]

## II.    Analysis

Ms. Byrd posits one objection to Judge Reid's Report.[74] She argues Judge Silverman erred in his treatment of medical opinion evidence and we should not adopt Judge Reid's recommendation we affirm Judge Silverman's denial of benefits. We conduct a *de novo* review of Ms. Byrd's objection to Judge Reid's Report.[75] We "may accept, reject, or modify, in whole or in part, [Judge Reid's] findings or recommendations[.]"[76]

Our review of Judge Silverman's findings is more deferential.[77] We must "affirm the ALJ so long as his conclusions are supported by substantial evidence."[78] "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[79] "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'"[80] "We review the record as a whole to determine whether substantial evidence supports a factual finding."[81] We must affirm Judge Silverman's findings of fact if substantial evidence supports them even if we might have reached a different conclusion.[82]

"The Social Security Administration, working through ALJs [Administrative Law Judges], decides whether a claimant is disabled by following a now familiar five-step analysis."[83] The judge determines whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of an impairment listed in appendix 1, in which case the claimant is presumed disabled; (4) can return to past relevant work; and, if not (5) can adjust to other work.[84] If the judge finds the claimant is or is not disabled at a step, the judge does not proceed to the next step.[85] Between steps three and four, the judge assesses the claimant's residual

functional capacity.[86] The judge assesses residual functional capacity (often referred to as RFC) based on all relevant evidence in the case record, including all severe and non-severe impairments and any related symptoms, such as pain, which may affect what work the claimant can do.[87] The judge uses the residual functional capacity assessment in step four to determine if the claimant can do her past relevant work and in step five to determine if the claimant can do other work.[88] The burden lies with the claimant for steps one through four; at step five, the burden "shifts to the Commissioner at step 5 to show . . . other jobs exist in significant numbers in the national economy that the claimant could perform."[89]

Ms. Byrd challenges Judge Silverman's rejection of medical opinions (namely Nurse Practitioner Korkus's) because it led him to find Ms. Byrd is not disabled under step five of the analysis.[90] She argues had Judge Silverman found Nurse Practitioner Korkus's opinion persuasive, he would have factored her inability to maintain competitive employment into the residual functional capacity, which would have precluded a finding she can perform alternative jobs.[91] Ms. Byrd claims Judge Silverman impermissibly substituted his own judgment for the judgment of a medical professional and did not provide a valid reason for rejecting medical opinion evidence.[92] She argues Judge Silverman erred in rejecting Nurse Practitioner Korkus's opinion about Ms. Byrd's off task time and absenteeism because he misconstrued Nurse Practitioner Korkus's reason for this finding.[93] Her arguments overlap but we address them in turn.

### A. Judge Silverman did not improperly substitute his lay opinion when analyzing medical opinion evidence.

Ms. Byrd argues by rejecting the medical opinions of Nurse Practitioner Korkus, Dr. Monfared, and the state agency medical consultants, Judge Silverman improperly relied on his own lay opinion to find Ms. Byrd can perform a full range of light work with some limitations.[94]

She claims Judge Silverman did not adequately explain how he arrived at these limitations without citing to medical evidence to support them.[95] We disagree.

"An ALJ must evaluate all record evidence in making a disability determination."[96] "The ALJ's decision must include 'a clear and satisfactory explication of the basis on which it rests' sufficient to enable a reviewing court 'to perform its statutory function of judicial review.'"[97] "Specifically, an ALJ must discuss the evidence that supports the decision, the evidence that the ALJ rejected, and explain why the ALJ accepted some evidence but rejected other evidence."[98]

We note the significant changes in how administrative law judges approach medical opinion evidence following the March 2017 amendments to the Social Security Administration's regulations. Before 2017, administrative law judges accorded great weight to treating physicians' reports.[99] For claims filed before March 2017 our Court of Appeals instructed an administrative law judge could "reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."[100] "For claims filed after March 27, 2017, the regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources."[101] When considering medical opinions for claims post March 2017, the judge considers (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors tending to support or contradict the medical opinion such as evidence the medical source has an understanding of other evidence in the claim or understanding of the disability program's policies and evidentiary requirements.[102] "[T]he two most important factors for determining the persuasiveness of medical opinions are consistency and supportability."[103]

Ms. Byrd argues even after the 2017 regulation changes "an ALJ is still required to provide a valid explanation for the rejection of medical opinions, based on contradictory medical

evidence."[104] We are not convinced contradictory medical evidence is still required. The earlier authority from our Court of Appeals seemingly required contradictory medical evidence because of the controlling weight given to treating physicians' medical opinions under the old regulations.[105] That controlling weight does not exist under the revised regulations.[106] But we need not decide the extent to which the 2017 revision changed administrative law judges' treatment of medical opinions. Even under the old rules contradictory evidence is only required if the judge rejects a treating physician's opinion ***outright***; otherwise, the judge "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."[107] For instance, the judge may permissibly afford the medical opinion little weight if the doctor's own progress notes does not support the opinion, other evidence in the records contradicts it, or it contains internal inconsistencies.[108]

Judge Silverman did not outright reject any medical opinions but rather explained why he found them (or portions of them) unpersuasive based on consistency and supportability as required under the new regulations.[109] As Judge Reid noted, "the ALJ's RFC assessment fell somewhere between the opinions of Nurse Korkus and Dr. Monfared, and also took into account [Ms. Byrd's] numerous medical treatment records."[110] This is permissible. "There is a critical difference between cases where an ALJ who finds that a claimant is not disabled when all of the medical opinions indicate that the claimant is disabled and cases where the ALJ assesses the RFC that falls between competing opinions."[111] An administrative law judge may—even under the old, stricter regulations—credit parts of an opinion without crediting the entire opinion.[112] "It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions."[113]

This balancing is precisely what Judge Silverman did. Nurse Practitioner Korkus's opinion supports a finding of disabled because she believes Ms. Byrd cannot stay on task or show up to work consistently. The opinions of Dr. Monfared, Dr. Smith, and Dr. Walker support a finding of not disabled because they believe Ms. Byrd can perform a range of medium exertional tasks. The opinions of Dr. Rattan and Dr. Rings support a finding of not disabled because they believe Ms. Byrd has moderate limitations but can perform simple tasks in a stable environment. Judge Silverman found Ms. Byrd's residual functional capacity is higher than the limitations supported by Nurse Practitioner Korkus's opinion, lower than the limitations supported by the opinions of Drs. Monfared, Smith, and Walker, and is consistent with the limitations supported by the opinions of Drs. Rattan and Rings. We consider Judge Silverman's treatment of each medical opinion.

***Nurse Practitioner Korkus.*** Despite noting internal inconsistencies in Nurse Practitioner Korkus's opinion, Judge Silverman did not reject the opinion outright and adopts portions of it in his decision. For example, he noted Nurse Practitioner Korkus's diagnoses of fibromyalgia and osteoarthritis with myofascial trigger points and fibromyalgia tender points. Judge Silverman plainly did not dispute these diagnoses; he listed them as severe impairments at step two and incorporated them into his residual functional capacity assessment. He also adopted Nurse Practitioner Korkus's view Ms. Byrd could handle low stress work. He did ***not*** find convincing the portion of Nurse Practitioner Korkus's opinion concerning Ms. Byrd's level of absenteeism and time off task because the record indicates Ms. Byrd is "alert and fully oriented."

Ms. Byrd argues when Judge Silverman found internal inconsistencies in medical opinions he should have cited to medical evidence to support his findings.[114] But the opinion is plainly inconsistent ***on its face***; Nurse Practitioner Korkus provided estimates as to how long Ms. Byrd can sit, stand, and walk but wrote a question mark when asked to estimate how many times a day

Ms. Byrd would need to sit, stand, and walk in a competitive work environment. It is unclear what evidence Judge Silverman could have cited to support this internal inconsistency.

Judge Silverman found Nurse Practitioner Korkus's findings are also inconsistent with Ms. Byrd's ***medical record*** because of her gap in treatment. Here Ms. Byrd argues Judge Silverman should specifically state what the absent emergency room records or ongoing treatment records should contain if they existed. We cannot give credence to an argument suggesting Judge Silverman should speculate what a medical record would contain if it existed. "[C]ourts have held that an ALJ may rely on a gap in treatment and conservative treatment . . . when assessing the veracity of the claimant's allegations of pain."[115] We acknowledge some of our colleagues suggest an administrative law judge must consider a claimant's proffered explanations for gaps in treatment.[116] Ms. Byrd argued in her request for review this gap in treatment occurred while she was receiving mental health treatment "on almost a monthly basis[.]"[117] It is true Judge Silverman's decision did not consider this as a proffered explanation for Ms. Byrd's gap in treatment. But, as Judge Reid found, the fact Ms. Byrd received treatment for her mental health issues at that time simply does not explain why she stopped seeking pain management and rheumatology treatment.[118]

***Dr. Monfared, Dr. Smith, and Dr. Walker.*** Judge Silverman rejected the opinions of Dr. Monfared, Dr. Smith, and Dr. Walker because they all lead to the conclusion Ms. Byrd can handle a range of medium exertional tasks, which Judge Silverman found unpersuasive. He cited internal inconsistencies in Dr. Monfared's opinion and Dr. Monfared's failure to address all of Ms. Byrd's impairments. Again, though, Judge Silverman cited portions of the opinions that he did not reject outright; for example, he stated it "was somewhat reasonable" Dr. Monfared only found a "history of" fibromyalgia because he did not find any fibromyalgia tender points during his single physical

examination of Ms. Byrd. Judge Silverman compared this finding to those of Dr. Smith and Dr. Walker, who relied on Dr. Monfared's opinion instead of reviewing Ms. Byrd's entire medical record, which contained evidence of fibromyalgia tender points. Judge Silverman concluded "a functional capacity that does not consider the claimant's fibromyalgia or obesity is not well supported by the entire record."

**Dr. Rattan and Dr. Rings.** Ms. Byrd argues Judge Silverman did not properly credit "ANY opinion of a medical provider in this case[.]"[119] But Judge Silverman did credit the opinions of the state agency psychologist consultants, both of whom concluded Ms. Byrd has moderate limitations but can follow simple instructions and perform simple, routine tasks in a stable environment. He noted their decisions were well supported, consistent with each other, and consistent with the record, which "demonstrates that the claimant's mental presentation remained grossly stable even in periods of increased mental health symptoms."[120]

We find Judge Silverman adequately considered the supportability and consistency of each medical opinion when determining its persuasive value. Ms. Byrd suggests the record evidence documenting her pain is more probative than the issues in Nurse Practitioner Korkus's opinion which led Judge Silverman to reject those portions favorable to Ms. Byrd.[121] We acknowledge and sympathize with Ms. Byrd for the well-documented pain she experiences. But "we may not 'weigh the evidence or substitute [our own] conclusions for those of the fact-finder[.]'"[122] Even if we would have decided Ms. Byrd's case differently, we are bound by Judge Silverman's decision if substantial evidence supports it.[123] We find it does.

**B.  Judge Silverman's erroneous reference to fibro fog does not warrant remand.**

We also consider Judge Silverman's misinterpretation of a portion of Nurse Practitioner Korkus's report. Judge Silverman mistakenly wrote Nurse Practitioner Korkus believed Ms. Byrd's

fibro *fog* would prevent her from concentrating at work when she actually wrote Ms. Byrd would have difficulties with concentration and attendance "due to fibro."[124] Judge Reid cited this meaningful error but concluded it does not warrant remand because Judge Silverman accounted for Ms. Byrd's fibromyalgia pain in his overall analysis and had other reasons for rejecting Nurse Practitioner Korkus's report.[125] Ms. Byrd challenges Judge Reid's finding as a "post hoc rationalization" and argues even if Judge Silverman offered statements about Ms. Byrd's fibromyalgia pain in the body of his decision he did not use that evidence to dismiss Nurse Practitioner Korkus's opinion.[126] She essentially argues if Judge Silverman found the opinion unpersuasive because he believed it relied upon an undocumented symptom, it was error for him to reject the opinion.

We are mindful "[n]either the reviewing court nor the defendant 'may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.'"[127] But Judge Reid did not consider post hoc rationalizations not listed by Judge Silverman when discussing the erroneous reference to fibro fog; he concluded in light of Judge Silverman's other findings and the rest of the decision the fibro fog error would not change the outcome of Ms. Byrd's case.[128] We agree.

"Where a reviewing court is confident that an ALJ error had no effect on the outcome of the case, remand is unwarranted."[129] The question here is whether Judge Silverman's decision would have been different if he had properly read Nurse Practitioner Korkus's reason for Ms. Byrd's off task time and absenteeism as fibromyalgia pain instead of mistakenly reading the reason as "fibro fog." We find it would not. Elsewhere in the opinion Judge Silverman did not find documented evidence of an abnormal effect in Ms. Byrd "despite her provider's statement . . . of fibromyalgia fog *or pain* causing poor concentration."[130] In other words, Judge Silverman plainly

recognized Nurse Practitioner Korkus believed fibromyalgia **pain** could cause Ms. Byrd to have poor concentration, and he did not find this persuasive, even if he later stated fibromyalgia **fog** was an unpersuasive reason for poor concentration. Even without this acknowledgement Nurse Practitioner Korkus relied on fibromyalgia pain in forming her medical opinion, Judge Silverman would have rejected her findings as to off task time and absenteeism for other reasons. Judge Silverman specifically rejected Nurse Practitioner Korkus's findings because Ms. Byrd "was universally noted to be alert and fully oriented[]"—evidence contradictory to a finding of poor concentration no matter what the cause.[131] And, as noted above, Judge Silverman further rejected Nurse Practitioner Korkus's opinion because of internal inconsistencies and the significant gaps in Ms. Byrd's treatment.[132]

We cannot affirm an administrative law decision based on rationale not present in the decision. But the record supports Judge Silverman's treatment of Nurse Practitioner Korkus's medical opinion. His erroneous reference to fibro fog did not impact his reasons for rejecting Nurse Practitioner Korkus's opinion, and ultimately did not change the outcome of his decision. This type of error does not require remand.

## III.    Conclusion

We deny Ms. Byrd's request for review. Judge Silverman did not improperly rely on his own lay opinion in treating the various medical opinions and he did not commit reversible error with his reference to fibro fog. Our *de novo* review of Judge Reid's Report and our more deferential review of Judge Silverman's findings supports our conclusion of substantial evidence, requiring we affirm Judge Silverman. We do not discern clear error on the face of the record requiring us to reject the portions of the Report to which Ms. Byrd does not object. We adopt Judge Reid's Report and dismiss Ms. Byrd's appeal.

---

[1] ECF 10-2 at 21 (using the pagination assigned by the CM/ECF docketing system) (Admin. Law Decision).

[2] ECF 10-6 at 25 (Work History Report).

[3] Ms. Byrd also addresses bipolar disorder and anxiety disorder. *See, e.g.*, ECF 11-2 at 211 (Creative Health Services Psychiatric Evaluation). We need not address Ms. Byrd's mental health conditions in detail because she only objects to Judge Reid's Report to the extent he recommends we affirm Judge Silverman's rejection of Nurse Practitioner Korkus's medical opinion, which solely concerns Ms. Byrd's **physical** conditions. *See generally* ECF 27. We note her sole objection is contrary to her counsel's opening statement at the hearing swearing Ms. Byrd "feels strongly that it is her **mental** health issues that prevent her from being able to work today." ECF 10-2 at 45 (Hearing Tr.) (emphasis added). Ms. Byrd's mental health conditions are not before us through her one objection.

[4] ECF 10-2 at 48–49 (Hearing Tr.).

[5] *See, e.g.*, ECF 11-3 at 32 (Penn Rheumatology Limerick Office Visit Report 7/28/2022).

[6] ECF 10-2 at 18, 21 (Admin. Law Decision).

[7] ECF 11-2 at 22–23 (PMA Consult Report 1/14/2020).

[8] *Id.* at 20.

[9] *Id.* at 23.

[10] ECF 11-2 at 32 (PMA Office Visit Report 2/13/2020).

[11] *See, e.g.*, ECF 11-2 at 42 (PMA Office Visit Report 8/28/2020), 50 (PMA Office Visit Report 10/1/2021).

[12] *See, e.g.*, ECF 11-2 at 34 (PMA Office Visit Report 2/13/2020), 51 (PMA Office Visit Report 10/1/2021).

[13] *See* ECF 11-2 at 42 (PMA Office Visit Report 8/28/2020), 50 (PMA Office Visit Report 10/1/2021). Ms. Byrd did go to the PMA practice on December 16, 2020, but it was not for her fibromyalgia or osteoarthritis. *See* ECF 11-2 at 47 (PMA Office Visit Report 12/16/2020).

[14] ECF 11-2 at 52 (PMA Office Visit Report 10/1/2021).

[15] *Id.* at 50.

[16] *Id.* at 51.

[17] ECF 11-3 at 32 (Penn Rheumatology Limerick Office Visit Report 7/28/2022).

[18] ECF 11-3 at 21 (Penn Primary Care Pottstown Office Visit Report 8/24/2022).

[19] *Id.* at 23.

[20] *See, e.g.*, ECF 11-2 at 32 (PMA Office Visit Report 2/13/2020), 163 (Performance Spine & Sports Physicians Report).

[21] *See* ECF 11-2 at 104–202, 407–70 (Performance Spine & Sports Physicians Reports).

[22] ECF 11-2 at 163 (Procedure Note 11/12/21), 167 (Procedure Note 12/3/2021).

[23] ECF 11-2 at 151 (Appointment Summary 1/10/2022).

[24] *Id.* at 155.

[25] ECF 11-2 at 332 (Physical Therapist Discharge Summary 3/15/2022).

[26] *Id.* at 333.

[27] ECF 11-2 at 532 (Procedure Note 3/11/2022), 533 (Procedure Note 3/18/2022).

[28] ECF 11-2 at 466 (Appointment Notes 4/1/2022).

[29] ECF 10-8 at 62–63, 68–69 (Phoenixville Hospital Inpatient Record).

[30] *Id.* at 69.

[31] ECF 11-2 at 38, 40 (PMA Office Visit Report 7/24/2020).

[32] ECF 11-3 at 29 (Penn Primary Care Pottstown Office Visit Report 8/8/2022).

[33] ECF 11-3 at 35 (Penn Rheumatology Limerick Office Visit Report 7/28/2022).

[34] ECF 11-1 at 417 (Imaging Result 7/20/2020); ECF 11-2 at 63 (same).

[35] ECF 11-2 at 47 (PMA Office Visit Report 12/16/2020), 63 (Imaging Result 12/2/2020).

[36] ECF 11-2 at 49 (PMA Office Visit Report 12/16/2020).

[37] ECF 10-2 at 18 (Admin. Law Decision).

[38] *Id.* Ms. Byrd previously applied for social security, but the Administrative Law Judge issued a denial to this first application on September 1, 2020. *Id.*

---

[39] *Id.*

[40] *Id.*

[41] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(1)(D)).

[42] 42 U.S.C. § 423(d)(l)(A). "The law and regulations governing the determination of disability are the same for both disability insurance benefits and [supplemental security income]." *Carmon v. Barnhart*, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (alteration in original) (quoting *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)). "We provide citations only to the regulations respecting disability insurance benefits." *Id.*

[43] *Id.* § 423(d)(2)(A).

[44] *See generally* ECF 10-2 (Admin. Law Decision). We are not today addressing whether Ms. Byrd's demonstrated ailments qualify as medical conditions which could result in a disability finding under different circumstances. "Because of the unavailability of objective clinical tests to confirm a diagnosis, fibromyalgia poses unique difficulties in the social security context." *Craig v. Astrue*, No. 11-215, 2013 WL 322516, at *4 (W.D. Pa. Jan. 28, 2013) (emphasis removed). Here, like in *Craig*, Judge Silverman "did not base his finding of not disabled on the lack of objective findings to support a diagnosis of fibromyalgia." *Id.* (emphasis removed). "In fact, [Judge Silverman] found that plaintiff's fibromyalgia is a severe impairment." *Id.* But "it is a well-established maxim of social security law that disability is not determined merely by the presence of an impairment, but by the effect that impairment has upon the individual's ability to perform substantial gainful activity." *Id.* (citing *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991)). Multiple of our colleagues have concluded a claimant has the RFC to perform light or sedentary work despite a diagnosis of fibromyalgia. *See, e.g.*, *Ferraro v. O'Malley*, No. 21-4674, 2024 WL 920056, at *2, *7 (E.D. Pa. Mar. 4, 2024) (affirming administrative law judge's finding the plaintiff had the RFC to perform sedentary work subject to limitations although she suffered from disorders of the spine, muscle/ligament disorder, and fibromyalgia); *Memnune A. v. Kijakazi*, No. 21-705, 2023 WL 3318599, at *4 (D.N.J. May 9, 2023) (affirming administrative law judge's finding the plaintiff had the RFC to perform light work subject to limitations although she suffered from arthritis, fibromyalgia, spondylitis, degenerative joint disease of the knees, and obesity).

[45] ECF 10-2 at 32–33 (Admin. Law Decision).

[46] *Id.* at 28–29; *see also* ECF 11-2 at 399 (Korkus Opinion).

[47] ECF 11-2 at 399–401 (Korkus Opinion).

[48] *Id.* at 400, 401.

[49] *Id.* at 401–02.

[50] *Id.* at 402.

[51] ECF 10-2 at 30 (Admin. Law Decision).

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at 30–31.

[56] *Id.* at 31.

[57] *Id.* at 23 (Admin. Law Decision) ("The following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis."), 31 ("I also agree that . . . the evidence does not support greater than moderate limitations."); 20 C.F.R. § 404.1545(a)(1).

[58] ECF 10-2 at 22, 25–26, 30 (Admin. Law Decision).

[59] *Id.* at 22.

[60] *Id.*

[61] ECF 10-2 at 53–58 (Hearing Tr.).

[62] *Id.* at 56.

[63] *Id.* at 55.

[64] *Id.* at 57–58.

[65] *Id.*

[66] ECF 10-2 at 33 (Admin. Law Decision).

[67] ECF 1 (Compl.) ¶ 5.

[68] *See generally id.*

[69] ECF 6 (Dec. 5, 2023 Order); ECF 25 (R&R).

[70] ECF 11-2 at 402 (Korkus Opinion); *see also* ECF 25 (R&R) at 5–6.

[71] *Id.*

---

[72] ECF 25 (R&R) at 6–7. "Fibro fog" refers to the cognitive problems which can accompany fibromyalgia. These problems with concentration and memory can lead to confusion, forgetfulness, and mixing up words or details. *See id.* at 5 n.3.

[73] *Id.* at 6–9.

[74] ECF 27 (Pl.'s Objs.). The Commissioner did not respond to her objection so we must consider it unopposed.

[75] 28 U.S.C. § 636(b)(1). We are not required to engage in *de novo* review of the portions of the Report Ms. Byrd does not object to. *Snyder v. Bender*, 548 Fed. App'x 767, 771 (3d Cir. 2013) (first citing *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984); then citing 28 U.S.C. § 636(b)(1)). "With regard to the portions of the R&R [Report and Recommendation] to which no objections are made," we review the face of the record for clear error "as a matter of good practice[.]" *Nelson v. Overmyer*, No. 10-4691, 2018 WL 6047088, at *4 (E.D. Pa. Nov. 19, 2018) (quoting *Latorre v. Wetzel*, No. 15-280, 2016 WL 3014874, at *1 n.2 (E.D. Pa. May 26, 2016)).

[76] § 636(b)(1).

[77] *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

[78] *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing *Craigie v. Bowen*, 835 F.2d 56, 57 (3d Cir. 1987)).

[79] *Id.* (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

[80] *Id.* (quoting *Rutherford*, 399 F.3d at 552).

[81] *Id.* (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir. 1999)).

[82] *Trinh v. Astrue*, No. 10-2960, 2011 WL 9362789, at *3 (E.D. Pa. June 20, 2011) (citing *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190–91 (3d Cir. 1986)).

[83] *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing §§ 404.1520(a)(4); 416.920(a)(4)).

[84] § 404.1520(a)(4)(i)–(v).

[85] *Id.* § (a)(4).

[86] *Id.*

[87] § 404.1545(a)(1)–(2).

[88] § 404.1520(a)(4).

89 *Devine v. Comm'r of Soc. Sec.*, No. 24-00017, 2024 WL 4372306, at *2 (E.D. Pa. Oct. 2, 2024) (first citing *Freeman v. Berryhill*, No. 17-01071, 2019 WL 2540650 at *4 (M.D. Pa. June 20, 2019); then quoting *Rutherford*, 399 F.3d at 551).

90 ECF 27 (Pl.'s Objs.) at 6.

91 *Id.*

92 *Id.* at 2–5.

93 *Id.* at 4–5.

94 *Id.* at 4.

95 *Id.*

96 *Carin F. v. O'Malley*, No. 22-4193, 2024 WL 3949322, at *11 (D.N.J. Aug. 27, 2024) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).

97 *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)).

98 *Id.* (first citing *Cottter*, 642 F.2d at 705–06; then citing *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505–06 (3d Cir. 2009); and then citing *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001)).

99 *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (first quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987); then citing § 404.1527(d)(2)).

100 *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (first citing *Plummer*, 186 F.3d at 429; then citing *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); and then citing *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)).

101 *Carin F.*, 2024 WL 3949322, at *11 (footnote omitted) (citing §§ 416.927; 416.920c(a)).

102 § 404.1520c(c).

103 Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017).

104 ECF 27 (Pl.'s Objs.) at 2.

105 *See Howells v. Kijakazi*, No. 21-848, 2022 WL 4609319, at *4 (W.D. Pa. Sept. 30, 2022) (emphasis added) ("[U]nder the applicable [pre-March 2017] regulations, an ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence . . . ." (first citing § 404.1527(c)(2); then citing *Fargnoli*, 247 F.3d at 43)).

<sup>106</sup> *See id.* ("[T]he previous version of the regulations . . . required substantially more attention to be paid to a source's treating relationship with the claimant in weighing that source's opinion.").

<sup>107</sup> *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)).

<sup>108</sup> *See Springer v. Comm'r Soc. Sec.*, No. 20-2861, 2021 WL 4796379, at *2 (3d Cir. Oct. 14, 2021) (doctor's notes did not support opinion of disability); *Smith v. Astrue*, 359 Fed. App'x 313, 316 (3d Cir. 2009) (contradictory evidence in the record and internal inconsistencies).

<sup>109</sup> *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5853.

<sup>110</sup> ECF 25 (R&R) at 8 n.4.

<sup>111</sup> *Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016).

<sup>112</sup> *Id.* (first citing *Thackara v. Colvin*, No. 14–00158, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); then citing *Turner v. Colvin*, 964 F. Supp. 2d 21, 29 (D.D.C. 2013); and then citing *Connors v. Astrue*, No. 10–197, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011)).

<sup>113</sup> *Id.* (citing *Thackara*, 2015 WL 1295956, at *5).

<sup>114</sup> ECF 27 (Pl.'s Objs.) at 3, 6.

<sup>115</sup> *Reilly v. O'Malley*, No. 21-02710, 2024 WL 290291, at *7 (E.D. Pa. Jan. 25, 2024) (first citing *Newbold v. Colvin*, 718 F.3d 1257, 1263-65 (10th Cir. 2013); then citing *Startz v. Colvin*, No. 12-5240, 2014 WL 441953, at *13 (N.D. Ill. Feb. 4, 2014)).

<sup>116</sup> *See Altman v. Colvin*, No. 15-1592, 2016 WL 7035058, at *2 (W.D. Pa. Dec. 2, 2016) (citing Burkenbine v. Colvin, No. 14-01539, 2016 WL 543148, at *5 (D. Or. Feb. 8, 2016)).

<sup>117</sup> ECF 16 (Pl.'s Request for Review) at 13.

<sup>118</sup> ECF 25 (R&R) at 7 ("[W]hatever Nicole B.'s level of mental health treatment, it was reasonable for the ALJ to infer that she would have sought pain control if her joint and body pain was as debilitating as described by Nurse Korkus.").

<sup>119</sup> ECF 27 (Pl.'s Objs.) at 6.

<sup>120</sup> ECF 10-2 at 31 (Admin. Law Decision).

<sup>121</sup> ECF 27 (Pl.'s Objs.) at 6.

<sup>122</sup> *Rutherford*, 399 F.3d at 552 (first alteration in original) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

[123] *Susan B. v. Comm'r of Soc. Sec.*, No. 21-12012, 2023 WL 1997694, at *3 (D.N.J. Feb. 14, 2023).

[124] Compare ECF 10-2 at 30 (Admin. Law Decision) at 30–31, with ECF 11-2 at 402 (Korkus Opinion).

[125] ECF 25 (R&R) at 6–9.

[126] ECF 27 (Pl.'s Objs.) at 3. Judge Reid notes Judge Silverman incorporated fibromyalgia pain into his overall disability analysis even if he does not specifically mention Nurse Practitioner Korkus in those portions of the decision. ECF 25 (R&R) at 6. It is true Judge Silverman plainly did not ignore Ms. Byrd's pain in reaching his finding of not disabled. But it is also true Ms. Byrd's objection concerns Judge Silverman's treatment of Nurse Practitioner Korkus's opinion, not the overall finding of disability. ECF 27 (Pl.'s Objs.) at 3. *If* Judge Silverman failed to recognize Ms. Byrd's pain formed the basis of Nurse Practitioner Korkus's opinion, and *if* he otherwise would have found the opinion persuasive, we are not convinced mentioning fibromyalgia pain as part of his overall disability analysis could constitute harmless error given the fact his disability decision likely would have been different had he accepted Nurse Practitioner Korkus's findings about Ms. Byrd's time off task and absenteeism. But Judge Silverman did in fact acknowledge Nurse Practitioner Korkus's opinion was based at least in part on fibromyalgia pain causing poor concentration, and even if he had not, Judge Silverman provided other reasons for finding the opinion unpersuasive. *See infra* pp. 24–25.

[127] *Wright v. Colvin*, No. 15-102, 2015 WL 4530384, at *13 (M.D. Pa. July 27, 2015) (first quoting *Hague v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007); then citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)); *see also Rae v. Berryhill*, No. 17-967, 2018 WL 3619247, at *4 n.5 (W.D. Pa. July 30, 2018) ("Thus, to consider post hoc rationalizations not listed by the ALJ runs contrary to the law." (citing *Fargnoli*, 247 F.3d at 44 n.7)).

[128] ECF 25 (R&R) at 8–9.

[129] *Pack v. Comm'r of Soc. Sec.*, No. 20-1128, 2021 WL 3682151, at *2 n.2 (W.D. Pa. Aug. 19, 2021) (first citing *Rutherford*, 399 F.3d at 553; then citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).

[130] ECF 10-2 at 29 (Admin. Law Decision) (emphasis added).

[131] *Id.* at 30.

[132] *Id.*